Good morning your honors, counsel. May it please the court, my name is Scott Kilpatrick representing the plaintiff and with me at counsel table is Mason Waring who will also work on this case. The plan says if you become disabled, your honor may I reserve two minutes for rebuttal? Yes you may. Thank you your honor. The plan says if you become disabled, your LTD plan benefit will not be subject to income tax. Aetna's interpretation of the SSDI offset as being gross as opposed to net in the absence of clear language to that effect renders this plan provision untrue. The certainty of the employee's expectation that they will receive 60% of their pre-disability earnings tax free comes from the reason for that favorable tax treatment. The reason for that favorable tax treatment comes from the immediately preceding sentence in the plan document which says you will be taxed on both your cost and the company contributions. In other words, all the premiums will be taxed up front. You'll have to pay them with after tax dollars. The next line, starting from the beginning again, however, if you become disabled, your LTD plan benefit will not be subject to income tax. Yes, but why does that govern the question of an offset for Social Security? And can we start with the question of the district court's view that this was not a denial of benefits nor was it a reduction in benefits? If we look at the case that way, then we have a sort of deferential look at what the company's interpretation of the plan language is. That's apart from Firestone. We wouldn't have to reach that question. But independently of that, there is a Firestone argument on behalf of the company that they clearly reserved discretion to draw these interpretations. Right. So I know the court wanted me to address first whether the reduction in Ms. Toriano's benefits by a gross amount of SSDI versus a net amount. Well, I don't know why it's a reduction. It's an assessment of what the plan language provides. Right. It is an assessment, but as a matter of mathematical truth, it is a reduction. She receives less. I see. So any time they receive less than what the claim is, you say that that then is a reduction in benefits under the statute. What cases do you have to support that? I don't have a case to support that specific characterization, Your Honor. In this situation, it's our position that the LTD plan provides that she is entitled, once she has paid premiums with after-tax dollars, she is entitled to receive a benefit equal to 60% of her pre-disability earnings. I know, but that's your interpretation. The company's interpretation of that language is really quite different. And then there's the question of the lens through which we have to look at this. Correct. So you can't avoid the question by standing up and saying, this is our interpretation of it. Counsel, please answer Judge Lynch's question. I apologize. I'm hearing a couple of different questions. Which specific question would you like me to address first? The question of whether there is deference under either of these theories. Your Honor, this was an appeal because we submit that it is a reduction of benefits. It is an offset, true. It's provided for under the plan. That's true. But this plan is expressed in one way and not expressed in another. So there are two terms, there are two parts of the policy that are in play here. The part that defines the amount of benefit is expressed. It's 60% of her pre-disability earnings. In order to get it, you have to pay all the premiums with after-tax dollars. But as a result, you get your benefit not subject to income tax. The plan states that quite clearly. The part of the plan that is not expressed but could be implied is that while it is expressed that you get that Aetna is entitled to take an SSDI offset, it is not expressed that that SSDI offset is gross or net. The plan is silent with respect to whether Aetna needs to take into account taxes in order to preserve the core element of the plan. Counsel, I get the sense that your point takes the view that initially the 60% of pre-disability earnings, that can be characterized as a long-term disability payment. And the plan says that it's to be calculated 60% of the pre-disability earnings. But once the SSDI benefits come into play and you have an offset, that characterization no longer applies. It's only the portion that is paid pursuant to the long-term disability plan. That is the long-term disability payment. The presence of the SSDI payments in the overall amount that your client receives, is actually not part of the long-term disability plan. It's now something different. Do you understand them to be making that argument? In effect, 60% doesn't apply to this offset portion. Isn't that what they're arguing? I think you're exactly right. That's exactly what they're arguing. What they're arguing is, and this is clever, that while the plan says you're going to get 60% of your pre-disability earnings not subject to tax, think about how that sounds to an employee at General Dynamics who has just paid taxes on all the premiums necessary to secure that benefit tax-free. What about the company's rationale that it would be irrational for it, as a plan sponsor, to come up with an interpretation of the plan that depends on each individual's beneficiary's calculation of that person's own income tax, as to which the company would have no information and no control. And that is a rational reason to support their interpretation. To begin, this would be much simpler than what Aetna does in every disability claim. In our case, because we had to respond to it. Well, why is it simpler? All they do is they take the amount that SSI says is payable to them. Isn't that quite simple? That would be very simple, but it is also to their insured's detriment. They keep the difference. Their insured is now receiving something less than 60% of her pre-disability earnings. Aetna is keeping the difference. Just something, Mr. Byrne, you were saying that's no more burdensome than what they do in any disability case. What did you mean by that? What I mean is that in any disability case, they hire experts at the cost of sometimes thousands of dollars. They pour through sometimes thousands of pages of documents. They send individuals for examinations, have them undergo diagnostic testing. To determine whether there's a disability. To make a decision on whether to pay and how much to pay. It's to determine whether they're disabled. They don't actually do it to figure out how much to pay. That's in the plan. If there's a disability, you do 60% of them. Unless it's a partial disability. Then they have to get involved in the math. They have to take into account earnings. Then it would be how long you were out or not. When they say we don't do taxes, there's no other circumstance in which they calculate the individual tax liability of any claimant, right? We think there is. We asked for a modicum of discovery on what they meant by we don't get involved. There's nothing on the face of the plan that you've identified that was before the district court. That's part of our record that indicates. In fact, they do this exact type of calculation in some other setting under the plan. Is that right? In the universe that you've defined, no. Okay. And then with respect to the reading that you were asking us to adopt, I take it you have some explanation of why the plan, though you think it should be read the way you did, manages not to give any guidance to the claimant as to how they would go about providing the information that the plan would then rely upon. And that seems like a big thing to be missing in the plan. Because it's not obvious what method or what papers the plan would have chosen in that regard. And there's simply no indication from the face of the plan that that kind of process is going to be undertaken. I take it you say that the text does, but in terms of how it would become operational, there's nothing in the plan that suggests how it would be done. The plan isn't perfect in that way. And I would suggest that the court should remand this matter back to the district court with instructions that they order Aetna to take into account the tax burden. Taking into account the tax burden, we had to. Excuse me. Yes, Your Honor. You did reserve two minutes. Thank you. A judge has a question. You can respond to this in those two minutes if you would. I would like to understand, because I think it so often is true in these cases, whether we're dealing with a discretionary review or de novo, I think that's very important. Your argument that they should not get the benefit of that discretionary language that they have in the plan, and I gather is that somehow this was an incomplete exercise of discretion in that, yes, at the stage of denial when they send a letter to their client explaining why her position will not be adopted, and then there was an attempt to appeal, no appellate process ensued at all. Correct. Because of that failure, is that why you argue at least in part that they're not entitled to the benefit of that discretionary language? That's correct. Can you answer it now? Yes. Go ahead. Thank you, Your Honor. We may reduce your time. Fair enough. The administrative record reveals that Aetna recognized that an appeal had been filed. They recognized that they had to take it up the ladder within the Aetna organization, and they even involved counsel, although all those communications are redacted, and although we were still within the fiduciary administrative claims process, yet they, for whatever reason, and there still has not been articulated a clear reason, with any case law or other statutory authority, they failed to respond to the appeal. And so that's why we think the Court should review the administrative records and plan documents under a de novo standard, Your Honor. Thank you. Thank you. Counsel. Thank you, and good morning, Your Honors. And may it please the Court, Jonathan Bond for Apellee's Aetna Life Insurance Company in the General Dynamics Plan. In this ERISA case, the governing plan documents make clear in their text and accessible examples that Ms. Troiano got everything she bargained for. The plan did provide a disability benefit for Ms. Troiano. Could you start with Judge Lopez's question and the argument that they're making that despite the plan saying that it is the employer, I'm sorry, Aetna is entitled to deference, Aetna isn't because Aetna somehow screwed up under the ERISA procedural requirements? Certainly, Your Honor. Now, Aetna did make a determination about how this plan applies here. That's in our April 2010 offset letter at JA-128 where we say, we have been apprised you're getting this much in Social Security, $17.83 a month. We quoted the plan language, we applied it to her case, and we said going forward, we're offsetting $17.83 a month, the full amount. So that determination has been made, discretion was exercised, and that is entitled to deference. Now, to the point about appellate procedure, Aetna's position is indeed, as we explain in the brief, that there is no adverse benefit determination here. There is no benefit denial in the language of the statute because we awarded benefits 13 years earlier. We are simply now applying a contractual ERISA provision for an offset, which we could apply without offsetting benefits simply by paying the full amount and then asserting a lien on her Social Security. We can do this in other ways, but no one would dispute or not a denial of benefits. So here... It seems like a word game, frankly. I mean, from her perspective, she has a benefit that is, yeah, you acknowledge she's entitled to a benefit, but a lesser benefit that she thinks she's entitled to. From the perspective of the claimant, there has been an adverse benefit determination. Well, from the perspective of the claimant, she separately agreed, and this is JA 176, to repay us in the separate agreement any overpayment that results from Social Security and other benefits that she or her dependents may become entitled to. So there's this separate right that Aetna has to be repaid, which helps to keep premiums low for these duplicative payments that she receives. Would that apply if you paid her 70% instead of 60%? It's true. It would apply. If the separate agreement doesn't... The logic of your position is it depends on a separate agreement. Would it apply even to a case in which the overpayment was now requested because of a claim that they gave her 70% rather than 60%, is that right? Well, if I understand your hypothetical, if we paid her more than the 60%, she was due, you're saying, right? And she would contest that. Supposed there was a dispute about whether you were right or wrong in interpreting the plan in your claim offset, where you're now trying to recoup it. Oh, if we paid her 70%, she would be better off. I suppose in a circumstance where... I'm sorry, 50%. If we paid her an erroneous amount, that still would not be a benefit denial. No, no. If you paid her 70%, you claim that you paid her 70% because of the way you read the plan. Now you're saying, I want to recoup that from her. Okay. She says, no, under the plan I got 60%. You're wrong to be reading it now as if you gave me more than 70%. I'm not talking about an offset, just how you read your maintenance of a month's calculation or something like that that was going on. Are you contending in that case the appellate procedures wouldn't apply if she now challenged your recoupment? Well, let's distinguish two situations, one in which we originally make the calculation and that calculation is just wrong in determining her initial benefit eligibility. That would be a benefits determination. This case was made in December 2003. If we made that calculation and years later a check just isn't issued one month or we issue the wrong amount one month, then she can seek relief under ERISA. She doesn't have to exhaust her administrative remedies because that's not a denial. But all of these issues about procedure ultimately don't make a difference in this case for several reasons. Before you get to the several reasons why it doesn't work, just finish this. This is helpful to me. I now understand why the example I was just talking to you about is not a case in which you, with the discretion of the appeals team, still matters. Why is this case different than that then? So this case is actually the scenario where it's similar to the second scenario we were discussing. So not the original determination is wrong and challenged, but later in time we are making a determination about how much to pay. And in this instance, because we have this separate entitlement to recoup a particular amount, which the plan document says we can do by offset, we're doing this separate from the original determination of benefits. We're simply saying you must repay us this existing amount. We are entitled to do that in an offset basis going forward. So this is not a denial of benefits. This is simply recouping money that separately you owe to us under your reimbursement agreement that's in the record. But, again, none of these procedural issues. Going forward is not a recoupment. Going forward is preventing recoupments because we could send her a check for the full amount each month and immediately claim the overdue or the duplicative portion. No, but that just is – I mean, listen, there's an entitlement for you to do that. But I still don't quite follow – and that's the contract that allows you to proceed in that fashion. And you're exercising your contractual right to do that. How does that get you around the separate ERISA right of her to appeal an adverse benefits decision? Because her right only attaches if we deny rights, if we deny benefits in the first instance. But assume it for argument's sake that this benefits denial rubric applies. It doesn't matter here for a few reasons. Among others, there's no prejudice here. This Court's case law is crystal clear from Recupero years ago to Stephanie C. earlier this year that even if we were required under a technical reading of the ERISA regs to provide a further response to Ms. Troiano, it doesn't matter so long as she had a sufficiently clear understanding of the administrator's position to permit effective review. That is, this litigation. It's clear that she did understand our position. But if she's not doing the procedure right, I don't understand how that gets you around Firestone, which makes some sense. We defer to – or is the idea that that knocks out the appellate thing and therefore knocks out the argument that it was an incomplete benefits determination? So then we just defer to the original? Right, because she's using the procedural rules to say we should get out of Firestone. We're saying – Because you had a threshold determination by the plan administrator and it just wasn't reviewed on appeal. That's exactly right. And so there's no prejudice here because our position was clearly communicated and she's been able to make all the arguments that she wished to make concerning the plan interpretation. And it's important on that note that even if you conclude that she's entitled to de novo review, the results still would be the same under the text of the plan documents, which are controlling, and the summary plan description, which is what her entire argument is premised on. The plan documents speak clearly to this in three provisions at JA 73 to 75. First is the monthly benefit formula that says we will offset other income benefits that are payable to you. That's not paid. That's certainly not left over after you pay your taxes at year end. Second is the definition of other income benefits. So if we're to de novo review, they say those kinds of arguments were never made. You're now relying on certain language in the plan itself. They say that those arguments were never made in your dealings with them and they were never even made in the district court, that you're now relying on language in the plan documents for the very first time on appeal and you're not entitled to do that. And with respect, they're not correct about that, Your Honor. We definitely made these arguments in the district court. Our summary judgment motion, docket entry 15, goes through the language of the plan at 11 and 12 and the summary plan description at 13 and 14. The district court addressed this very language in its opinion at addendum pages 73 to 74 and concluded that the plain language supports our position. As to the administrative dealings, our very first communication about the offset in April 2010 quotes the language, the definition of other income benefits, and the fact that they include all benefits payable to you. That's the top of JA 129. So that language was presented to her. When she finally responded to that 15 months later, she raised no argument based on the plan or summary plan descriptions language. She simply said in her short letter in July 2011, please, this is through counsel, please give me a different amount. I understand you're going to reduce or offset my benefits on a gross basis, but please do it on that basis. And we responded, no, we don't get into that. It's industry standard and it requires getting into taxation, which we don't do. For good reason, as the colloquy earlier suggested, we cannot do that kind of individual determination because of the many variables that go into the taxability of individual income. The change every year would require us to take in a tremendous amount of private information from individuals about their taxes and ultimately to audit that information. Well, they say put the burden on the claimant, but say to them they have to have their own accountant provide you with the information that you would then need to understand what those tax implications are. Well, with respect, Your Honor, they do not say provide us with all of that information. They say prepare a fake tax return, which they would have us accept at face value. If I may finish the response. Yes, you may. We cannot simply accept that at face value. The tax return that they're having us prepare isn't accepted or reviewed by any government authority, so we would have to audit the underlying documents to determine the accuracy of those calculations, and that is simply impracticable on a year-by-year, individual-by-individual basis. Am I right that if they were... There's nothing in the plan that specifies in any respect what the process would be for implementing the reading that the claimants contend is reasonable. That's exactly right. The only information the plan requires them to submit to us and contemplates we will have is the information about the exact amount awarded from Social Security, nothing about their taxes, which would require us to deal with an entirely new frontier of information. The Court has no further comments. But this was all so clear and transparent and easy. Why did Edna struggle, as they clearly did, to come up with an answer to this fairly simple proposition that the offset should be net rather than gross? The representatives who got the inquiry, they didn't know what to do. They had to ask a number of people in the company what to do. It finally goes up to the General Counsel, who then offers a somewhat opaque explanation. Well, this is the industry standard. You prove this is somehow self-evident from the plan. It seems like it was far from self-evident from the plan, and in fact the explanation doesn't even rely on the plan language. It relies on sort of a vague industry practice. Well, a few points on that, Your Honor. The initial, the only confusion, such as it was, was the first-line reviewer who said, I know that we don't do net offsets. I can't find the language in the plan. What comes out of that internal colloquy is our November 2011 letter where we say to the claimant, to her counsel particularly, no, that's exactly right. This is industry standard, and we do not get involved in taxation. Recall we're responding to a letter that doesn't say anything about the plan language, We're simply saying 15 months after we've made our determination quoting the plan language, no, we don't get involved in that kind of tax offset that you're requesting. Was there a time period for appeals in the plan? There was. It was 180 days, and if we apply the adverse benefit determination framework to this case, the benefit denial would have been April 2010. That follows under this Court's decision in Riley. When we send the original determination of how much we're going to pay, that's when the clock starts. Did you ever, if that's the determination, did you ever advise the claimant of her appeal rights? Did you ever tell her about the right to appeal and the time within which that should be done? So we did both in the plan and in the December 2003 original award letter. But, again, our position is not that this is an adverse benefit determination. I understand. Right. Our point is simply that we don't agree with that. Did you acknowledge that you then had an obligation to deliver that information in the denial letter? We acknowledged that the ERISA regulations would require that. But setting the limitations period aside, even setting aside the internal appeal deadline, at a minimum, that was still what started the clock. She did challenge that in her July 2011 letter, to which we responded. So on any view, that would be the end of the appeal process, and there would be no right to continue appealing. She cannot continue sending letters to us and insist on responses that would change the standard of review. On any standard of review, Aetna's interpretation of the plan we submit is correct and certainly reasonable. It should be adopted. Let me just make sure I understand. If we didn't agree with all of that, so let's say we say we're on the no vote review, and we thought it was unclear, what are we supposed to do at that stage? Are we supposed to just give our best guess? If the court concludes that the language of the plan itself does not speak clearly, then, yes, the court should review the contract itself in light of the practical consequences of her reading, in light of the lack of any precedent for it, whereas the Eighth Circuit has specifically upheld our interpretation applied by a different insurer, and should conclude, yes, this is by far the more plausible reading of this language, and it's the one that she was on notice of through the summary plan description, which provided that mathematical example to explain exactly how this is supposed to operate. Your scheduled benefit minus the Social Security benefit for which you qualify equals your monthly payment. So there's no expectation-based argument on the plan or the summary plan description, which is provided actually by the employer, not by FEDMAC. Counsel, if we're dealing with the no vote review, why should the administrative burden factor into the analysis at all? I can see why the administrative burdens would further support the exercise of discretion by the administrator making the decision that it did, but if we're just looking at plan language pursuant to the no vote review and conclude that the language is ambiguous, in that situation, these somewhat familiar doctrines of construing the language in a way that's most favorable to the insured, what are the reasonable expectations of the insured, those come into play, but where does, at least I think I do, you may disagree, but where in that type of analysis does the administrative burden threaten? Where does that factor into the analysis? Sure, so just to be clear, we maintain that deferential review is appropriate, and under deferential review, there's no contra preferentum. But in the no vote review, we submit several things. Now, first, contra preferentum or construing against the insurer requires ambiguity and requires not just that there be some ambiguity, but that the competing interpretation be plausible in light of the text, and that's what we submit. Ms. Troiano hasn't submitted. She has no interpretation of payable, of required or provided for, or eligible to receive. I mean, look at that definition. It's not, this is on JA-74, it's not simply types of benefits. Some of those items, those line items in the definition, have built-in quantitative caps. The very first item, Jones Act awards, only the first 50% count. Pension pen benefits, only if they're employer paid. So you can't read into that language an implicit limitation. So even if there's some play in the joints, it doesn't stretch to, and we will reimburse your personal taxes. Now, to the relevance of the administrative burden, that goes to the plausibility of her interpretation. If she's offering a gloss on the text that would require administrators, year after year, to calculate tens of thousands of participants' individual taxes and to do so responsibly to audit those taxes to some extent, the fact that nothing in the plan, as she admits, supports that interpretation we submit, is sufficient to demonstrate that it is implausible. It is not within the realm of reasonable interpretations of the language, even if there were some ambiguity in the text. Okay, thank you. Thank you, Your Honor. One minute. I'd like to use my one minute to talk about ambiguity. In order to view ambiguity in the way that my brother explains, we have to view it purely through Aetna's lens, to use your Honor's language. To view this from the employee's, from the beneficiary's lens, in order to read in gross or before taxes, before the SSDI offset, or frankly any of the offsets, you have to assume that the employee is reading these offsets to deliberately displace already taxed income with not yet taxed income, solely for the benefit of the beneficiary. Why doesn't the financial example they give take care of that issue? Because it's extremely elementary, and what it does not say is it does not say something very simple. Like in D&H therapy, the insurance company failed to include language that could have resolved the situation. In this situation, if Aetna wanted to deliberately displace, may I finish, Your Honor? Yes. Already taxed income with not yet taxed income solely to its own advantage, they could have said so. They could have said SSDI benefits are offset. We understand it's going to be offsetting already taxed benefits, but that's the way it is. They didn't say that. Thank you, Your Honor.